**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHARLES CLENDENNY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 14-115 (RDM) |
| THE ARCHITECT OF THE CAPITOL, | |
| *Defendant*. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Charles Clendenny and Mark Ingram bring this action against their employer, the Architect of the Capitol ("AOC"), for an alleged violation of the Congressional Accountability Act, 2 U.S.C. § 1301 *et seq.* ("CAA"). Plaintiffs are employed as insulators at the AOC, and their responsibilities include performing "asbestos abatement" procedures in the buildings used by the United States House of Representatives. They allege that, after refusing to use a vacuum they believed to be unsafe to perform an abatement procedure, their supervisors unlawfully retaliated against them by transferring them to a lower-paying shift and by depriving them of overtime work opportunities. Dkt. 1 at 8 (Compl. ¶ 38). The AOC moves for summary judgment, Dkt. 19, arguing that their retaliation claims fails for two reasons: first, because Plaintiffs "never made a valid safety complaint nor opposed any unlawful practice," *id.* at 3, 15–19, and, second, because the AOC, in any event, had legitimate, non-retaliatory reasons for altering Plaintiffs' work schedules and continued to offer Plaintiffs opportunities to work overtime, *id.* at 3, 20–23. For the reasons explained below, the Court concludes that genuine disputes of material fact preclude the entry of summary judgment. The Court will, accordingly, deny the AOC's motion.

## I. BACKGROUND

For the purpose of considering the AOC's motion for summary judgment, the Court will construe the evidence in the light most favorable to Plaintiffs, who are the nonmoving parties. *See Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

Clendenny began work as an insulator at the AOC in 1997, and received his asbestos "supervisor's card" shortly thereafter.  Dkt. 20-9 at 1; Dkt. 20-4 at 17–22 (Clendenny Dep. 17–22).  Because he held this certification, Clendenny was permitted to serve as the "competent person" on asbestos abatement procedures, and he was "responsible" for ensuring that the procedures were conducted safely.  Dkt. 20-4 at 18 (Clendenny Dep. 18); *see also* 29 C.F.R. § 1926.1101(o) (requiring employers to "designate a competent person" that possesses "the qualifications and authorities for ensuring worker safety and health" for each asbestos worksite).  Ingram worked as a contractor at the AOC from 1999 to 2003, and became a full-time employee in 2003.  Dkt. 20-1 at 16–17, 25–27 (Ingram Dep. 16–17, 25–27).  Although he held a "worker's card" allowing him to perform asbestos abatement procedures, Ingram was required to work on an abatement team with a "competent person," like Clendenny.  *Id.* at 23–24 (Ingram Dep. 23–24).  As a result, Plaintiffs were generally paired together to complete assignments.  Dkt. 20-38 at 6–7, 10 (Pls.' SMF ¶¶ 20–22, 40); Dkt. 20-6 at 20 (Follin Dep. 20) ("Chuck and Mark . . . were a team.").

As insulators, Plaintiffs' "major duties" included the "application, repair and/or removal of insulation," the "containment of asbestos[,] and asbestos removal."  Dkt. 19-1 at 1 (AOC's SUMF ¶ 3).  Asbestos-related procedures occupied roughly eighty percent of their time.  Dkt. 20-10 at 49 (Williams Dep. 49).  Prior to August of 2013, Plaintiffs were assigned to the night shift, which ran from 3:30 a.m. to 12:00 p.m., Monday to Friday.  Dkt. 20-23 at 1; Dkt. 19-10 at 1.

This work schedule entitled Plaintiffs to a "nighttime differential" pay increase of ten percent. Dkt. 20-1 at 113–14 (Ingram Dep. 113–14); Dkt. 20-11 at 24–26 (Clayborne Dep. 23–25).

At the time they were constructed, the House office buildings used asbestos "as an insulation material" for their plumbing systems.  Dkt. 20-2 at 34 (Murphy Dep. 34).  Because it is now understood that "[a]ll forms of asbestos are known to cause diseases," Dkt. 20-3 at 3, the AOC insulators must safely remove, or "abate," the insulation that covers the buildings' pipes before completing any repairs, Dkt. 20-2 at 34 (Murphy Dep. 34).  To do so, Plaintiffs generally use the "glove bag method" of asbestos abatement, which entails wrapping the portion of an asbestos-insulated pipe that must be replaced or removed with an "impervious plastic bag-like enclosure," wetting the asbestos fibers to keep them from becoming friable, sealing the bag with a vacuum cleaner, cutting away the pipe with the appropriate tools from inside the vacuum-sealed bag, and then disposing of the bag and its contents.  Dkt. 20-4 at 23–35 (Clendenny Dep. 23–35); Dkt. 20-1 at 44–50 (Ingram Dep. 44–50); *see generally* 29 C.F.R. § 1926.1101(b), (g)(5).  Although the vacuum is used to seal the bag rather than to remove its contents, water used to wet the asbestos fibers regularly "get[s] . . . in[to] th[e] vacuum cleaner."  Dkt. 20-4 at 85 (Clendenny Dep. 85).  In addition, if the bag tears during the glove bag procedure, the vacuum is used to "clean . . . up" any spilled asbestos materials.  Dkt. 20-1 at 96 (Ingram Dep. 96); *see also* Dkt. 20-10 at 139 (Williams Dep. 139) ("What if a bag splits open and drops?  Then you vacuum it up.").

From start to finish, an asbestos abatement procedure performed by a pair of insulators takes approximately three hours to complete.  Dkt. 20-1 at 46 (Ingram Dep. 46).  Moreover, because most asbestos abatement projects are performed "in areas where either the public or [C]ongress or their staff is in circulation," Dkt. 20-10 at 32 (Williams Dep. 32), unless there is an

emergency, glove bag procedures are ordinarily performed overnight when the buildings are

empty, typically wrapping up between 6:00 a.m. and 7:00 a.m., Dkt. 20-13 at 17 (Green Dep.

63–64); *see also* Dkt. 20-7 at 23–24 (McGinnis Dep. 23–24) ("No way you can [perform an

abatement procedure] in the hallways or, you know, congressmen's offices [during the day.] . . .

7:00's about the limit.").

In mid-2013, the vacuum Plaintiffs had been using to perform abatement procedures for

the past several years was "thrown away," Dkt. 20-1 at 89 (Ingram Dep. 89); Dkt. 20-4 at 83

(Clendenny Dep. 83), and Plaintiffs were provided a Nikro-brand replacement vacuum, Dkt. 20-

17 at 1; Dkt. 20-38 at 19 (Pls.' SMF ¶¶ 73–74).  By August 6, 2013, however, they concluded

that the replacement vacuum was not suitable for "wet" pickups because the label affixed to the

vacuum read: "USE FOR TOXIC DUST RECOVERY ONLY[.]  WET PICK-UP WILL

CAUSE SERIOUS DAMAGE TO FILTERS."  Dkt. 20-17 at 2; *see also* Dkt. 20-19 at 2; Dkt.

20-1 at 87–90 (Ingram Dep. 87–90); Dkt. 20-4 at 82–85 (Clendenny Dep. 82–85).  Clendenny

informed Daryl Williams, the AOC insulation team leader, about Plaintiffs' concerns with the

replacement vacuum, Dkt. 20-1 at 90 (Ingram Dep. 90), and on August 8, 2013, Plaintiffs were

asked to attend a meeting to address the issue, Dkt. 20-19 at 2.  That meeting was attended by a

number of their supervisors, including Assistant Superintendent Dan Murphy, General

Supervisor Greg Green, and, Assistant Supervisor Brian Bradley.  *Id.* at 2–3; Dkt. 20-38 at 20

(Pls.' SMF ¶ 78).

At the meeting, Plaintiffs informed their supervisors that they "absolutely" could not "use

[the Nikro] vacuum cleaner[]" for glove bag abatement procedures because it was "not a wet

vac."  Dkt. 20-4 at 84–87 (Clendenny Dep. 84–87); *see also* Dkt. 20-8 at 173 (Bradley Dep. 173)

("They said the vacuum that they had was not the correct vacuum, and if they used it, it would be

destroyed."); Dkt. 20-19 at 2.  Because an "abatement . . . had to happen that night" in a

congressman's office, Murphy informed Plaintiffs that "the vacuum [wa]s expendable," and, if it

had to be discarded after the abatement was completed, "that's what [Plaintiffs] needed to do."

Dkt. 20-8 at 173 (Bradley Dep. 173).  Ingram remembers Green repeatedly requesting that

Plaintiffs use the Nikro vacuum for the procedure, despite both Plaintiffs' protests.  Dkt. 20-19 at

2–3; Dkt. 20-1 at 93–94 (Ingram Dep. 93–94).  After some back and forth, Ingram acquiesced

and agreed to do the abatement with the Nikro vacuum, but Clendenny objected vehemently and

eventually left the meeting.  Dkt. 20-4 at 88 (Clendenny Dep. 88).  A few moments later,

Clendenny spoke with Ingram in the parking lot and reaffirmed that he "w[ould] not do the job

with [the Nikro] vac."  Dkt. 20-19 at 3.  He added, "Mark, you know we can't use that.  It's

illegal to do that.  You can't do that."  Dkt. 20-4 at 88 (Clendenny Dep. 88).  Ingram shared

Clendenny's concern that they would be "breaking the law" if they used the Nikro vacuum, but,

given how "hard" his supervisors had "pushed," he was also worried "about [their] job[s]."  Dkt.

20-19 at 3.  After thinking further about it, Ingram called Bradley to let him know that he too

would not use the vacuum because he felt that it was "unsafe" to do so.  Dkt. 20-1 at 97 (Ingram

Dep. 97).

The next day, Williams located a "junkie wet vac," and Plaintiffs completed an

abatement procedure.  Dkt. 20-19 at 4; Dkt. 20-4 at 93 (Clendenny Dep. 93).  On August 13,

2013, new vacuum cleaners were delivered, and, once again, Plaintiffs refused to use them for

asbestos abatement procedures because of further safety concerns.  Dkt. 20-19 at 6; Dkt. 20-4 at

90 (Clendenny Dep. 90).  Plaintiffs allege that, as they unpacked the new Dayton-brand

vacuums, Clendenny noticed that the "Operating Instructions & Parts Manual" warned, "Do not

use this unit to pickup endangering dusts or substances."  Dkt. 20-22 at 1.  Plaintiffs informed

Williams about their concerns, Dkt. 20-4 at 90 (Clendenny Dep. 90), and after Williams

discussed the issue with Green, the AOC acquired an "asbestos wet pickup" vacuum roughly "a

week later," which Plaintiffs felt comfortable using, *id.* at 90–91 (Clendenny Dep. 90–91).

On August 9, 2013—the day after Plaintiffs' meeting with their supervisors—Green sent

Murphy an email "requesting th[at] two of our insulators, Mark Ingram[] and Chuck Clendenny,

have their shift changed from Monday to Friday, 3:30 a.m.–12 noon to Sunday through Thursday

6 a.m.–2:30 p.m." Dkt. 20-23 at 1. The move, Green suggested, would "save money" and

would allow the AOC "to accomplish more abatement and insulation in areas that c[ould] only

be worked during off hours." *Id.* Although Williams, Plaintiffs' direct supervisor, had not yet

been alerted to the change, Dkt. 20-10 at 107–08 (Williams Dep. 107–08), on August 19, 2013,

Green and Bradley informed Plaintiffs that the AOC had decided to transfer them to the day

shift, effective September 22, 2013, Dkt. 20-4 at 62–64 (Clendenny Dep. 62–64); *see also* Dkt.

20-24 at 1 (August 14, 2013 memo). Plaintiffs' newly assigned shift was not eligible for the

nighttime pay differential, Dkt. 20-8 at 69–70 (Bradley Dep. 69–70); *see also* Dkt. 20-13 at 16

(Green Dep. 57) ("We were aware that they would lose their differential, yes."), and Plaintiffs

also allege that, since their shifts were changed, the AOC has offered them fewer overtime work

opportunities than it has offered to its other insulators, *see* Dkt. 20-25 at 1 (chart showing

Plaintiffs working 150 to 200 fewer hours of overtime than other AOC insulators); *see also* Dkt.

20-1 at 114 (Ingram Dep. 114); Dkt. 20-4 at 95 (Clendenny Dep. 95).

Plaintiffs filed a timely Request for Counseling and participated in a series of mediation

sessions as required by the CAA. *See* Dkt. 1 at 2–3 (Compl. ¶ 9); *see also* 2 U.S.C. § 1401.

After the mediation period ended, Dkt. 1 at 3 (Compl. ¶ 9); 28 U.S.C. §§ 1404(2), 1408,

Plaintiffs filed this suit under the CAA, alleging that the AOC deprived them of opportunities to

earn the "nighttime pay differential" and overtime compensation in retaliation for opposing

unsafe working conditions at the AOC.[1]  The AOC's motion for summary judgment is now

before the Court.  Dkt. 19.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the moving party is entitled to summary

judgment if it can "show that there is no genuine dispute as to any material fact and [that it] is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When, as here, the plaintiff bears

the ultimate burden of proof but the defendant has moved for summary judgment, the defendant

"bears the initial responsibility" of "identifying those portions" of the record that "demonstrate

the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  A fact is "material" if it could affect the substantive outcome of the litigation.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007).  The Court, moreover, must view the evidence in the light

most favorable to the nonmoving party and must draw all reasonable inferences in that party's

favor.  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

"Although summary judgment is not the occasion for the court to weigh credibility of

evidence, . . . summary judgment is appropriate if the nonmoving party fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

---

[1]  Jurisdiction is proper in this Court pursuant to 2 U.S.C. § 1408(a) ("The district courts of the
United States shall have jurisdiction over any civil action commenced under section 1404[.] . . .
A civil action may be commenced by a covered employee only to seek redress for a violation for
which the employee has completed counseling and mediation.").  Venue is proper in this district
as the AOC is a government agency located in the District of Columbia and a "substantial part of
the events . . . giving rise to the claim occurred" in the District of Columbia.  28 U.S.C.
§ 1391(b).

party will bear the burden of proof at trial." *Id.* (internal citations and quotation marks omitted). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

## III. ANALYSIS

The AOC contends that Plaintiffs' retaliation claims fail for two reasons: First, it argues that the CAA's anti-retaliation provisions are inapplicable "because the vacuums Plaintiffs . . . claim were unsafe were," in fact, "in full compliance with the federal regulations governing glove bag asbestos abatement work," and thus Plaintiffs "never . . . opposed any unlawful practice." Dkt. 19 at 3, 15–19. Second, it maintains that, even if the Court were to conclude that Plaintiffs opposed an unlawful request to use non-compliant vacuums for asbestos abatement procedures, the AOC altered Plaintiffs' work schedules for "legitimate, non-retaliatory reasons"—namely "(1) to provide more coverage for potential emergencies while allowing a full day (Sunday) of uninterrupted abatement work; and (2) to reduce overtime and other costs." Dkt. 19 at 20 (citing to the depositions of Assistant Superintendent Murphy and General Supervisor Green). The Court will consider each of the AOC's arguments in turn.[2]

---

[2] Also before the Court is Plaintiffs' motion for leave to file a sur-reply. Dkt. 24. The "decision to grant or deny leave to file a sur[-]reply is committed to the sound discretion of the [C]ourt," and in making its decision, "the [C]ourt considers whether the sur-reply is helpful to the

A.     **Opposition to an Unlawful Practice**

Under the CAA, the House of Representatives, the Senate, and various agencies of the

legislative branch, including the AOC, must comply with a number of specified federal laws.

*See* 2 U.S.C. §§ 1301(3)(F), 1302(a).  The Occupational Safety and Health Act of 1970

("OSHA"), 29 U.S.C. § 651 *et seq.*, is among these laws.  2 U.S.C. § 1302(a)(6).  In particular,

the CAA requires that covered legislative agencies "comply with the provisions of section 5 of

[OSHA]."  *Id.* § 1341(a); *see also Harrison v. Architect of the Capitol*, 964 F. Supp. 2d 71, 80–

81 (D.D.C. 2013) (noting that "the [CAA] . . . extends the provisions of [OSHA] to the

legislative branch").  The CAA, moreover, makes it "unlawful for an employing office to . . .

take reprisal against . . . any covered employee because the covered employee has opposed any

practice made unlawful by [the CAA]," including the workplace safety requirements of OSHA.

2 U.S.C. § 1317(a); *see also Duncan v. Office of Compliance*, 541 F.3d 1377, 1380 (Fed. Cir.

2008) (holding that "the CAA unambiguously extends its anti-reprisal protections to OSHA-

related claims"); Dkt. 19 at 12–13.

Under the OSHA regulations governing asbestos abatement procedures, "vacuum

cleaners equipped with HEPA filters" must be used to "collect all debris and dust containing"

asbestos.[3]  29 C.F.R. § 1926.1101(g)(1)(i).  "Wet methods, or wetting agents," are required

---

adjudication of the motion [for summary judgment] and whether the defendant will be unduly prejudiced if the court grants leave to allow the sur-reply."  *Akers v. Beal Bank*, 760 F. Supp. 2d 1, 3 (D.D.C. 2011).  Here, the AOC has responded to Plaintiffs' sur-reply with a brief of its own, Dkt. 25, and the Court finds the additional briefing from both parties beneficial to its resolution of the AOC's motion for summary judgment.  Accordingly, the Court will grant Plaintiffs' motion to file a sur-reply, Dkt. 24, and the sur-reply brief, Dkt. 24-1, is deemed filed.

[3]  The parties do not address the question whether the OSHA *regulations* apply to congressional offices and agencies.  Under the CAA, the Board of Directors of the Office of Compliance is charged with issuing regulations to implement the Act's occupational safety and health protections.  2 U.S.C. § 1341(d)(1).  Those regulations promulgated by the Office are to "be the same as the substantive regulations promulgated" under OSHA by the Secretary of Labor,

whenever feasible in order to "control employee exposure." *Id.* § 1926.1101(g)(1)(ii).  When

these methods "are not sufficient to reduce employee exposure to or below the permissible

exposure limit," the employer is required to "supplement them by the use of respiratory

protection." *Id.* § 1926.1101(g)(2)(v).  "Glove bag" procedures—the type of abatement

procedure performed by Plaintiffs—also specifically requires a "HEPA vacuum" to "collapse[]"

the bags "by removing the air within" them.  *Id.* § 1926.1101(g)(5)(ii)(B)(5).

It is undisputed that both the Nikro and Dayton vacuum cleaners that Plaintiffs were

asked—and refused—to use to perform glove bag procedures were equipped with HEPA filters.

Dkt. 20-4 at 86 (Clendenny Dep. 86); Dkt. 20-1 at 94 (Ingram Dep. 94).  According to the AOC,

this fact is dispositive "[b]ecause the only requirement under the law [pertaining to] a vacuum

for glove bag operations is for [the vacuum] to have a HEPA filter."  Dkt. 19 at 15.  That means,

in the AOC's view, that, even though Plaintiffs objected to the use of Nikro and Dayton vacuum

cleaners, they did not actually oppose a "practice made unlawful by" the CAA and OSHA.  2

U.S.C. § 1317(a).  Plaintiffs respond that, "[i]n order for anti-retaliation protections to apply," an

"employee must show only that he had a reasonable good faith belief that he was opposing

conduct that violated the . . . law," and they assert that their refusal to use the vacuums to

---

"except to the extent that the Board may determine, for good cause shown . . . , that a
modification of such regulations would be more effective for the implementation of the
[relevant] rights and protections." *Id.* § 1341(d)(2).  The parties, however, do not cite to any
CAA implementing regulations, nor has the Court been able to find any addressing occupational
safety and health.  Assuming that the Board has not adopted any such regulations, one might
reasonably conclude, as the Court of Appeals for the Federal Circuit has apparently done, that
the CAA's incorporation of Section 5 of OSHA includes OSHA's requirement that the employer
"comply with occupational safety and health standards promulgated under" OSHA.  *See Duncan*,
541 F.3d at 1379 (quoting 29 U.S.C. § 654(a)(2) and discussing its "exten[sion] . . . to legislative
employees").  The Court need not resolve this issue, however, because as explained below, the
CAA clearly incorporates OSHA's general duty clause, 29 U.S.C. § 654(a)(1), which, if
anything, provides a stronger basis for Plaintiffs' claims than the Department of Labor
regulations.

perform the glove bag procedures was reasonable in light of the vacuums' labels and operating instructions.  Dkt. 20 at 8.

As an initial matter, the AOC has not met is burden on summary judgment of demonstrating that use of the Nikro and Dayton vacuums was consistent with the CAA and OSHA.  Among other things, OSHA contains two operative clauses—the specific duty clause, which the AOC addresses, and the general duty clause, which it does not.  *Compare* 29 U.S.C. § 654(a)(1) (general duty clause) *with id.* § 654(a)(2) (specific duty clause).  Under the general duty clause, an employer is required to "furnish to each of his employees . . . a place of employment which [is] free from recognized hazards that are . . . likely to cause death or serious physical harm to [the] employee." *Id*. § 654(a)(1).  The promulgation of specific OSHA standards, moreover, does not "displace the general duty" to provide employees with a workplace "free from recognized hazards." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Gen. Dynamics Land Sys. Div.*, 815 F.2d 1570, 1577 (D.C. Cir. 1987).  An employer violates the general duty clause when "'(1) an activity or condition in the employer's workplace present[s] a hazard to an employee, (2) either the employer or the industry recognize[s] the condition or activity is a hazard, (3) the hazard was likely to . . . cause[] death or serious physical harm, and (4) a feasible means to eliminate or materially reduce the hazard exist[s].'" *SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1207 (D.C. Cir. 2014) (quoting *Fabi Constr. Co. v. Sec. of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007)).  Significantly, "[w]hether a work condition poses a recognized hazard is a question of fact." *Id.* at 1208.

As both parties recognize, glove bag abatement procedures require workers to wet down the asbestos to guard against the fibers becoming airborne, Dkt. 19 at 5; Dkt. 20 at 2, and the applicable regulations mandate the use of "[w]et methods, or [a] wetting agent," to "control

employee exposures," 29 C.F.R. § 1926.1101(g)(1)(ii).  Although the Nikro vacuum that

Plaintiffs were told to use did contain an HEPA filter, the vacuum's label warned: "WET PICK-

UP WILL CAUSE SERIOUS DAMAGE TO FILTERS."  Dkt. 20-17 at 2.  As Ingram explained

during his deposition, "when you pick up water" with a dry vacuum, "it attacks the filter" and the

"filter breaks down," which is "not safe."  Dkt. 20-1 at 87–88 (Ingram Dep. 87–88).  The AOC

responds that, in a glove bag procedure, the vacuums are only used to seal the bag around the

pipe, not to "pick up dust or debris."  Dkt. 19 at 6.  But Plaintiffs counter that water often "get[s]

. . . into" the vacuum and its "fiber filter" during the "vacuum sealing" process, Dkt. 20-4 at 85

(Clendenny Dep. 85), and that, if the glove bag were to rip, the vacuum would be used to clean

up the resulting spill of wetted-down asbestos fibers, *see* Dkt. 20-1 at 96 (Ingram Dep. 96

("What if the bag breaks and I have to use the vacuum to clean it up?  What do I do then, in a

congressman's office?"));  Dkt. 20-10 at 139 (Williams Dep. 139 ("What if a bag splits open and

drops?  Then you vacuum it up.")).  The Court need not, and should not, resolve this factual

dispute on summary judgment.  For present purposes, it is sufficient to conclude that a

reasonable jury might find that use of the Nikro vacuum posed "a recognized hazard."  *SeaWorld

of Fla.*, 748 F.3d at 1208.

For similar reasons, a reasonable jury could find that use of the Dayton vacuum also

posed a recognized hazard.  The Dayton vacuum, like the Nikro vacuum, came equipped with a

HEPA filter.  Dkt. 19 at 16–17; Dkt. 20-1 at 94–95 (Ingram Dep. 94–95).  The front page of the

"Operating Instructions & Parts Manual," however, included an "important safety instruction[,]"

warning users against "us[ing] [the vacuum] to pickup endangering dusts or substances."  Dkt.

20-22 at 1.  The AOC does not dispute that asbestos is an "endangering dust[] or substance[,]"

but, rather, argues that the Dayton vacuum's HEPA filter satisfied any safety concerns.  Dkt. 19

at 17. Plaintiffs disagree. Ingram, for example, pointed out in his deposition that even "[y]our vacuum cleaner at home has a HEPA filter," but the fact that a vacuum includes a HEPA filter does not mean that a vacuum designed for residential use would also be safe or appropriate for industrial asbestos procedures. Dkt. 20-1 at 94–95 (Ingram Dep. 94–95). Viewing the facts in favor of the nonmoving parties, the warning contained in the operating manual for the Dayton vacuum supports that assertion.

Accordingly, based on the record as it currently stands, a reasonable jury could find that use of the Nikro and Dayton vacuums posed "recognized hazards . . . likely to cause death or serious physical harm to" Plaintiffs. 29 U.S.C. § 654(a)(1). Although less clear, the Court is also unconvinced that the AOC has demonstrated that, as a matter of law, use of the vacuums complied with OSHA's specific duty clause and the governing regulations. The AOC premises is argument on the contention that the only relevant OSHA requirement was that the vacuum's have HEPA filters. Dkt. 19 at 15. But, even if that is correct, it is hard to imagine that this regulation can be construed as indifferent to whether the HEPA filter is functional, and Plaintiffs have established that a reasonably jury could find that (1) there was a material risk that their use of the Nikro vacuum would have involved some "pick up" of water, and (2) if that occurred, the HEPA filter would have been destroyed, rendering the use of the vacuum unsafe. *See* Dkt. 20-17 at 2; Dkt. 20-1 at 87–88 (Ingram Dep. 87–88); Dkt. 20-4 at 85–89 (Clendenny Dep. 85–89).

For present purposes, however, the Court need not decide whether use of the Nikro and Dayton vacuums violated OSHA—or whether a reasonable jury might find that use of the vacuums would have violated OSHA. Rather, all that Plaintiffs are required to establish in support of their retaliation claim is that their opposition to use of the vacuums was based on their "reasonable belief" that using the vacuums to perform asbestos abatement procedures would

have violated the law.  Although few cases have addressed the elements of a retaliation claim

under the CAA, "[c]ourts have consistently relied on judicial interpretations of Title VII when

addressing the substance of . . . retaliation claims brought under the CAA," *Newton v. Office of

the Architect of the Capitol*, 905 F. Supp. 2d 88, 92 (D.D.C. 2012) (collecting cases), and the

D.C. Circuit has offered detailed guidance in applying the analogous Title VII standard.

Like the "opposition" clause found in Title VII, 42 U.S.C. § 2000e-3(a), the CAA's

"opposition" clause makes it unlawful for a covered employer to discriminate against a covered

employee "because the . . . employee has opposed any practice made unlawful by" the CAA.  2

U.S.C. § 1317(a).  As the D.C. Circuit has explained in the Title VII context, this language might

be construed in one of two ways:  It might apply "only if the challenged practice is indeed . . .

'an unlawful employment practice,'" or it might apply "to situations where the employee

reasonably believes the practice to violate" the law.  *Parker v. Baltimore & Ohio R.R.*, 652 F.2d

1012, 1019 (D.C. Cir. 1981).   Recognizing that "[t]he remedial purpose of [the opposition

clause] would be ill served by telling employees . . . that internal opposition, though encouraged,

is undertaken 'at the accuser's peril,'" *id.* (citation omitted), however, the Court of Appeals has

repeatedly rejected the former option and has embraced the latter.  *See, e.g.*, *Grosdidier v. Broad.

Bd. of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013); *McGrath v. Clinton*, 666 F.3d 1377, 1380

(D.C. Cir. 2012); *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005).  Employees,

accordingly, are not put to "the sometimes impossible task of correctly anticipating how a given

court will interpret a particular statute" and need establish only a "good faith, reasonable belief

that the challenged practice violates" the law.  *Parker*, 652 F.2d at 1020 (quotation marks

omitted).

"Viewing the evidence most favorably to" Plaintiffs, there is sufficient evidence for a reasonable jury to find that their complaints were based on "a good faith and reasonable belief that the practices [at issue were] unlawful." *Grosdidier*, 709 F.3d at 24. First, there is sufficient evidence that Plaintiffs believed that use of the Nikro vacuum was illegal. Clendenny testified in his deposition that he urged Ingram not to use the vacuum because it would be "illegal" to do so, Dkt. 20-4 at 88 (Clendenny Dep. 88), and Ingram's notes show that he shared Clendenny's concern that they would be "breaking the law" if they used the Nikro vacuum, Dkt. 20-19 at 3. Second, for the reasons discussed above, that belief was objectively reasonable. This is not a case in which the relevant legal standards were "[]settled" or devoid of "ambiguities," *cf. King v. Jackson*, 487 F.3d 970, 973 (D.C. Cir. 2007); it is undisputed that exposure to asbestos poses a risk of "death or serious physical harm," 29 U.S.C. § 654(a)(1); and the actual danger posed to Plaintiffs turns on an assessment of disputed facts. Put simply: There can be little doubt that Plaintiffs' objections would have been reasonable if they had good cause to believe that use of the vacuums posed a material risk of asbestos exposure (and thus death or serious physical harm), and *that* assessment turns on disputed facts.

Accordingly, the Court concludes that a reasonably jury could find that Plaintiffs reasonably believed they were opposing an unlawful request from their supervisors to use vacuums that had the potential to put them, and the public, in danger of asbestos exposure.

## B.     Retaliation

Retaliation claims made under the CAA "are analyzed under the same standards as Title VII retaliation claims." *Newton*, 905 F. Supp. 2d at 92. In cases, like this one, in which the plaintiff lacks "direct evidence of . . . retaliation, the burden shifting framework" set forth "in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies." *Noisette v. Lew*, 11-cv-1594

(RDM), 2016 WL 5674786, at *9 (D.D.C. Sept. 30, 2016); *see also Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) ("[R]etaliation claims based on circumstantial evidence . . . trigger the familiar burden-shifting framework of *McDonnell Douglas*.").  Under that framework, the plaintiff "must first make out a prima facie case of . . . retaliation, and the burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its action."  *Noisette*, 2016 WL 5674786 at *9.  Once the employer has proffered a legitimate, non-retaliatory reason for its actions, however, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  Instead, at that point, the relevant inquiry is "whether there is sufficient evidence for a reasonable jury to find that the [employer's] asserted rationale is pretextual and that the real reason for [its] action was to retaliate against the employee for engaging in protected activity."  *Noisette*, 2016 WL 5674786, at *10 (citing *Jones*, 557 F.3d at 678); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) ("[A] plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause for the alleged adverse action by the employer.").  "A plaintiff opposing summary judgment may raise an inference that the employer's purpose was retaliatory by pointing to evidence attacking the employer's proffered reasons, together with other evidence, if any, suggesting that retaliation was the real reason" for the employer's actions.  *Allen v. Johnson*, 795 F.3d 34, 39–40 (D.C. Cir. 2015).  Whether "the available evidence suffices to support a jury finding of retaliation" ordinarily requires "a contextual judgment."  *Id.* at 40.

The AOC proffers two "legitimate, non-retaliatory reasons" to justify its decision to change Plaintiffs' work schedules, asserting that moving Plaintiffs from a Monday-to-Friday night shift to a Sunday-to-Thursday day shift: (1) "provide[d] more coverage for potential

emergencies" while adding another "full day (Sunday) of uninterrupted abatement work;" and (2) "reduce[d] overtime and other costs."  Dkt. 19 at 20.  The crux of the issue before the Court, accordingly, is whether Plaintiffs have shown that there is a genuine dispute of material fact about whether those stated grounds are pretextual and whether the AOC, in fact, transferred Plaintiffs to a less lucrative shift and reduced their overtime hours because they complained about allegedly unsafe working conditions.  In an effort to meet this burden, Plaintiffs point to the proximity in time between their complaint and the AOC's decision to change their work schedules; to purported inconsistencies in the testimony of the AOC's witnesses; and to what they characterize as the incoherence of the AOC's explanation for the schedule change.  *See, e.g.*, Dkt. 20 at 1, 15–26, 44–45.  As explained below, the Court concludes that Plaintiffs have identified genuine issues of material dispute that preclude the entry of summary judgment.

First, as Plaintiffs emphasize, there is evidence demonstrating that the AOC's decision to move them to a lower-paying shift was initiated the day after Plaintiffs rebuffed their supervisors' requests to use the Nikro dry vacuum for an abatement procedure.  *See* Dkt. 20-23 at 1 (August 9, 2013, email from Green to Murphy formally "requesting" the schedule alteration).  As the D.C. Circuit has recognized, "[t]he temporal proximity of an adverse action close on the heels of protected activity is a common and highly probative type of circumstantial evidence of retaliation."  *Allen*, 795 F.3d at 40; *see also Mount v. Johnson*, 174 F. Supp. 3d 553, 565 (D.D.C. 2016) ("[P]laintiffs commonly attempt to show retaliatory motive by emphasizing the close temporal proximity between the adverse action and the protected activity.").  Although the force of the inference may vary based on the delay between the protected activity and the adverse action, *see Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), there is no better claim to temporal proximity than an adverse action taken the day after the protected activity.

The AOC disputes the premise of Plaintiffs' temporal proximity argument, claiming that the schedule change "had been contemplated for over a year" before it was imposed.  Dkt. 19 at 9.  The evidence on that point, however, is murky at best and contradictory at worst.  Most notably, although Greg Green (the General Supervisor) testified at deposition that Dan Murphy (the Assistant Superintendent) "had been talking about" the schedule change "for over a year," Dkt. 20-13 at 11 (Green Dep. at 39), Murphy testified that he was not "approached" about the schedule change until much later, Dkt. 20-2 at 79 (Murphy Dep. 79).  According to his testimony, the issue was not raised with him "until August or so," or "maybe it was July," but, in any event, "it was sometime after May."  *Id*.  For purposes of resolving the pending motion for summary judgment, the Court must "view all of the evidence in the light most favorable to" Plaintiffs, *Arrington*, 473 F.3d at 333, and must, accordingly, assume that the decision was not made until August 2013—that is, in close proximity to the time that Plaintiffs complained about the safety of the Nikro vacuum.

This, however, does not resolve matters because, as the AOC correctly observes, "positive evidence beyond mere proximity is required to defeat the presumption that [its] proffered explanations are genuine."  Dkt. 23 at 13 (quoting *Allen*, 795 F.3d at 47).  That is, Plaintiffs must identify some additional evidence that, when considered along with the temporal proximity, would allow a reasonable jury to conclude that the AOC's proffered rationale was pretextual.  Additional inconsistencies in the testimony of the AOC's witnesses and their explanations for the schedule change provide this required additional support.

First, and most significantly, a reasonable jury might reasonably question the AOC's stated reasons for changing the Plaintiffs' schedule based on conflicting testimony about *who* prompted the change.  On August 9, 2013, Green sent an email to Murphy "requesting th[at] . . .

[Plaintiffs] have their shift changed," explaining that the move would "save money" and would allow the insulators "to accomplish more abatement[s]." Dkt. 20-23 at 1. A few hours later, Murphy responded: "Please explain how 8 hours on Sunday is more productive than the 2.5 hours per day for 5 days of Monday–Friday (3:30–6)?" *Id.* The natural reading of this exchange is that Green generated the idea to transfer Plaintiffs, and Murphy then sought further justification for that idea. And, that is precisely how Murphy described the chain of events at his deposition: When shown the email, he confirmed that it was "the email in which . . . Green first brought [him] the specific plan of shifting" Plaintiffs "to the Sunday-to-Thursday shift." Dkt. 20-2 at 80 (Murphy Dep. 80). Green, however, described a different chain of events. According to his deposition testimony, it was Murphy's idea to make the schedule change, and, in fact, Green actually "resisted th[e] idea." Dkt. 20-13 at 13 (Green Dep. 45–46). As Green explained the email exchange, Murphy asked that Green send him "a written explanation" for the schedule change that they had been discussing, "[e]ven though" the schedule change was Murphy's "idea." *Id.* at 15 (Green Dep. 55–56). This inconsistency over who actually originated and promoted the decision to change Plaintiffs' work schedules raises a plausible inference that the AOC's stated reasons for its action were pretextual.

Regardless of its genesis, moreover, the skepticism in Murphy's August 9th email about whether the schedule change would actually achieve the objective that Green first identified of facilitating more abatement procedures is well-taken. Abatement procedures, whenever possible, are scheduled "when the public is [not] around the [House office] building[s]," Dkt. 20-10 at 62 (Williams Dep. 62), and, accordingly, insulators seek to complete their abatement procedures before members of Congress, their staffs, and the public arrive in the morning, generally finishing before 8:00 a.m., Dkt. 20-2 at 41 (Murphy Dep. 41 ("[W]e would prefer that all work

and cleanup . . . would be completed by that 7:30 time period when the doors open.")); Dkt. 20-7

at 23–24 (McGinnis Dep. 23–24 ("No way you can [perform an abatement procedure] in the

hallways or, you know, congressmen's offices . . . . 7:00's about the limit.")); Dkt. 20-13 at 17

(Green Dep. 63 (confirming that 6:00 a.m. on weekdays is "about the time [he] wanted the

abatement work to start getting wrapped up")).  Because a standard glove bag asbestos

abatement procedure takes a two-man team roughly three hours to complete, Dkt. 20-1 at 46

(Ingram Dep. 46), shifting Plaintiffs from a 3:30 a.m. start-time to a 6:00 a.m. start-time meant

that, rather than having enough time to complete one glove bag procedure each morning,

Plaintiffs could not complete *any* glove bag procedures on a typical weekday, *see* Dkt. 20-2 at 99

(Murphy Dep. 99) (pointing out that "sliding" Plaintiffs' start-time back meant that AOC "would

not have the two of them available to do the abatement work in the morning").  Even assuming

that Plaintiffs could work on abatement procedures for their full Sunday shifts,[4] their new

schedule *reduced* the number of abatement procedures they could reasonably be expected to

complete in a given week from five to two.  Hence, it appears that Murphy was correct to inquire

how Plaintiffs' new schedule "[wa]s more productive than" their old schedule.  Dkt. 20-23 at 1.

To the extent that one of the AOC's goals was, as it argues in its briefing, to "provide

more hours of coverage for potential asbestos abatement work," Dkt. 23 at 11, then the change to

Plaintiffs' schedule was not just grossly ineffective, but incoherent—and, given Murphy's email,

a reasonable jury could find that it was knowingly so.  Although the Court is mindful that it is

not to act as "a super-personnel department" intent on "reexamining [AOC's] business

---

[4]  Plaintiffs do not concede this point, referencing numerous statements from AOC employees
suggesting that the morning cut-off for abatement procedures that applied on weekdays also
applied on weekends when Congress was in session.  *See* Dkt. 20-38 at 13 (Pls.' SMF ¶ 50).

decisions," *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007), the Court must consider

whether a reasonable jury could find that the AOC's stated rationale is not "[]worthy of

credence," *Jones*, 557 F.3d at 678 (quotation marks omitted).  Here, the AOC has yet to offer a

cogent explanation for how the schedule change might possibly have increased the number of

abatements Plaintiffs were able to perform.  The "insulator leader" testified that he told his

supervisors "at least three times" that it would make more sense to move Plaintiffs back to their

original shift, *see* Dkt. 20-10 at 95–96 (Williams Dep. 95–96 (explaining that Williams, the

leader of the insulation team, told his supervisor that the "benefits of having [Plaintiffs] there in

the morning outweighed having [them] there on Sundays")), and Murphy himself expressed

doubt about that rationale.

      To be sure, Green modified his justification for the proposed schedule change after he

received Murphy's email asking if he could "explain how 8 hours on Sunday is more productive

than 2.5 hours per day for 5 days of Monday–Friday."  Dkt. 20-23 at 1–2.  Thus, in his second

email, Green continued to tout the "8 hours of uninterrupted scheduled abatement work" that

Plaintiffs would be able to accomplish, but shifted the focus of his explanation to a different

rationale:  The schedule change would "allow greater coverage to meet the general needs of the

division and to cover any emergencies that may arise."  *Id.* at 2.  And, indeed, the AOC takes a

similar approach in its motion for summary judgment.  It continues to mention the "additional

abatements" rationale in passing, *see* Dkt. 19 at 20–21 (Plaintiffs' "schedules were adjusted to

provide more hours of coverage for potential asbestos abatement work."); *see also* Dkt. 23 at 11

(same), but emphasizes, instead, the other rationales given in Green's second email—that is,

better "coverage for potential emergencies" and "reduc[tion] [in] overtime . . . costs," Dkt. 19 at

20.  That shift in focus, however, presents a double-edged sword:  It reduces the AOC's reliance

on the difficult-to-fathom "additional abatements" rationale, but it also supports the reasonable

inference that Green and Murphy were in search of a rationale to support a decision, rather than

making a decision based on a rationale.  The shift in rationale between Green's first email and

his second email is particularly striking because it was made in a matter of hours.  *See* Dkt. 20-23

at 1–2.  Such a precipitous change in rationale, prompted by Murphy's observation that Green's

initial rationale made little sense, could lead a reasonable jury to infer that *both* the original and

the modified rationales were pretextual.  *See Allen*, 795 F.3d at 40 ("[C]ommon ways of proving

invidious motive . . . include pointing to evidence . . . that there were changes and

inconsistencies in the employer's given reasons for the decision." (quotation marks omitted));

*Brady*, 520 F.3d at 495 n.3 ("Employees often try to cast doubt on an employer's asserted

reason" by "pointing to . . . changes and inconsistences in the stated reasons for the adverse

action.").  Although one or more of the rationales that the AOC now features—that is, an

increase in emergency coverage and a reduction in overtime costs, Dkt. 19 at 20–22—might, in

some situations, support the entry of summary judgment, *see Kirk v. Small*, No. 03-cv-5360,

2004 WL 1249294, at *1 (D.C. Cir. June 7, 2004) (mem.) (noting that a plaintiff must

"demonstrate that each of [her employer's] proffered nonretaliatory reasons for the termination

of [the plaintiff's] employment was pretextual"), evidence that an employer has offered shifting

rationales or has engaged in an effort to rationalize a decision that had already been made is

generally sufficient to create an issue of fact for the jury.

Here, viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have shown

that the AOC decided to change their work schedules the day after they raised a significant safety

concern; that the AOC's witnesses dispute who was behind the schedule change; and that the

AOC was prepared to rely on whatever rationale might plausibly support that decision.

Accordingly, the Court will deny AOC's motion for summary judgment.[5]

## CONCLUSION

Defendant's motion for summary judgment, Dkt. 19, is hereby **DENIED**.  Plaintiffs'

motion to file a sur-reply, Dkt. 24, is hereby **GRANTED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 15, 2017

---

[5]  The Court also acknowledges that Plaintiffs allege that the AOC retaliated against them by "depriv[ing] them of overtime opportunities."  Dkt. 1 at 8 (Compl. ¶ 38).  Because the Court finds that the AOC's decision to transfer Plaintiffs to a shift that eliminated their eligibility for the nighttime pay differential constitutes an adverse action for the purposes of deciding the AOC's summary judgment motion, the Court expresses no opinion on whether Plaintiffs have shown that the AOC deprived them of overtime opportunities, or whether the AOC has treated Plaintiffs differently from other insulators with respect to overtime work assignments since they refused to use the Nikro dry vacuum to perform an asbestos abatement procedure in August of 2013.